## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 29 2015, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Nicole A. Zelin<br>Pritzke & Davis, LLP<br>Greenfield, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Larry D. Allen<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joseph Merriman, III,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 29, 2015<br><br>Court of Appeals Case No.<br>30A01-1503-CR-119<br><br>Appeal from the Hancock Superior Court<br><br>The Honorable Terry K. Snow, Judge<br><br>Trial Court Cause No.<br>30D01-1401-FD-1016 |

**Pyle, Judge.**

# Statement of the Case

Appellant/Defendant, Joseph Merriman III ("Merriman III"), appeals his conviction for Class D felony residential entry,[1] which was based on his breaking and entering the house of his grandfather, Joseph Merriman ("Merriman Sr."). On appeal, he argues that: (1) there was insufficient evidence that he entered Merriman Sr.'s house to support his conviction; and that (2) his trial counsel provided ineffective assistance for failing to object under Evidence Rule 404(b) to the State's introduction of evidence of Merriman III's alleged prior bad acts. We affirm because we conclude that there was sufficient evidence to support Merriman III's conviction, and he was not prejudiced by his trial counsel's lack of objection.

We affirm.

# Issues

1. Whether there was sufficient evidence to support Merriman III's conviction for Class D felony residential entry.

2. Whether Merriman III received ineffective assistance of trial counsel.

---

[1] IND. CODE § 35-43-2-1.5. We note that, effective July 1, 2014, this statute was amended and Merriman III's offense would now be considered a Level 6 felony. However, we will apply the version of the statute in effect at the time of his offense.

# Facts

[3] Merriman Sr. lives in Greenfield, Indiana, and is a pastor of a church located two lots from where he lives. He "basically raised" his grandson, Merriman III, who grew up living with him. (Tr. 34). For a period of time before 2013, Merriman III, his ex-wife, and their four children lived with Merriman Sr. However, they later moved out, and Merriman Sr. let Merriman III stay at the church near his house because he did not have anywhere to stay. The last time Merriman III resided at the church was in 2013, although he kept some of his belongings there until March of 2014.

[4] In December 2013, Merriman Sr.'s wife died, and his relationship with Merriman III deteriorated. At some point before May 2014, Merriman Sr. noticed that he was missing some of his belongings—a handgun, five hundred dollars in cash that had been in a safe in the church, two other firearms, and their accessories that had been in his house. He believed that Merriman III had taken the items.

[5] After Merriman III moved out of Merriman Sr.'s house, he kept receiving mail there, and his ex-wife would pick up the mail and deliver it to him. On May 15 or 16, 2014, Merriman Sr. received a gun permit in the mail addressed to "Joseph D. Merriman" without the III specified. (Tr. 40). However, he knew the permit was intended for Merriman III because it listed his age and birth date. As a result, he notified Merriman III's ex-wife and the mother of two of his other children "that [Merriman III] had until Sunday night to get [Merriman

Sr.'s] guns back or [he] was [going] to get in touch with State Police because [Merriman III] did not live there and he was the III and not Sr." (Tr. 40).

[6] On May 18, 2014, Merriman Sr. had church, then went to his son's house sometime afterwards, and did not get home until 8:00 or 9:00 p.m. that night. When he left his house, both his front and back door were locked, and his garage was shut. That afternoon, Merriman Sr.'s neighbor, Michael Estep ("Michael"), was mowing the lawn in the lot next to Merriman Sr.'s house when Merriman III drove up in a white Pontiac Grand Am. Merriman III approached Michael and asked if he knew whether Merriman Sr. was home. Michael told him that he did not know, but Merriman asked him the same question "approximately four to five times." (Tr. 88). Finally, Merriman III walked back to his car and left.

[7] Later that day, around 6:00 to 7:00 p.m., Michael and his wife, Pamela Estep ("Pamela") (collectively, "the Esteps"), were leaving for dinner when they noticed the Pontiac Grand Am sitting in front of the church and Merriman III walking to the back of Merriman Sr.'s house. Michael saw Merriman III motion to two females in the Pontiac Grand Am, so he circled around the block to see what was happening and observed the Pontiac Grand Am drive to Merriman Sr.'s house and pull into the driveway.

[8] The next morning, Merriman Sr. went to take out his trash and noticed that one of the "kicker plates," which is the part of a door that normally locks the door lock, of his back door was on the floor. (Tr. 63). He went to the door and

concluded that the door had been forced open because both of the locks on the door and their kicker plates were damaged. Subsequently, he searched his house and discovered that the only item missing in the house was the gun permit he had received in the mail.

[9] Merriman Sr. contacted law enforcement, and Officer Jon Anderson ("Officer Anderson") with the Greenfield Police Department responded to the scene. Officer Anderson observed that the doorframe of the back door had "obvious damage." (Tr. 63). Because Officer Anderson left his police vehicle outside of the house, Pamela saw the police vehicle and visited Merriman Sr. later that day. When she heard that someone had entered the house, she told him what she and Michael had witnessed the prior night. Merriman Sr. relayed the information to Officer Anderson, who then also interviewed the Esteps.

[10] Subsequently, Detective John Cutler ("Detective Cutler") with the Investigation Division of the Greenfield Police Department contacted Merriman III and asked him to come in to the Police Department for an interview. On June 4, 2014, Merriman III complied with Detective Cutler's request, and Detective Cutler interviewed him. The Detective recorded a video of the interview.

[11] Thereafter, on June 19, 2014, the State charged Merriman III with Class D felony residential entry. On July 29, 2014, Merriman III motioned for the court to order the State to disclose prior to trial any 404(b) evidence—"evidence of other crimes, wrongs, or bad acts by [Merriman III] or any defense witness"—

that it intended to introduce at trial. (App. 17(a)).[2] The trial court granted the motion on July 30, 2014.

[12] On January 5, 2015, the trial court held a jury trial. At trial, Merriman Sr. testified that he believed Merriman III had been the person who entered his house on the night of May 18, 2014. The following exchange occurred between the State and Merriman Sr.:

> [STATE:] And did you—at that time did you have any idea who would have done this?
>
> [MERRIMAN SR.:] Yes, I did.
>
> [STATE:] And at that point based—based on what?
>
> [MERRIMAN SR.:] Based on the fact that I had uh, had three guns missing. Based on the fact that I got a gun permit that wasn't mine. Based on the fact that I had given a three day ultimatum uh, to have my guns back and then he could have the permit.
>
> [STATE:] Okay. And had you uh,–so who do you think do it— that did it at that time? Who do you think did it?
>
> [MERRIMAN SR.:] My grandson.

(Tr. 44). Merriman III's counsel did not object to this testimony.

[13] The State also solicited testimony from Detective Cutler, Merriman's ex-wife, and his ex-girlfriend regarding the fact that Merriman Sr. believed Merriman III

---

[2] This page is actually page 18 of the Appellant's Appendix, but Merriman III has labeled it as 17(a).

had stolen his guns and the other items in the church. When Detective Cutler testified, the State introduced the video of his June 4, 2014 interview of Merriman III into evidence without objection. In the video, the Detective questioned Merriman III about his grandfather's belief that he had stolen his guns. Then, when Merriman's ex-wife testified, the State asked if she had ever had a conversation with Merriman Sr. about the gun permit, and she testified:

> I ran into [Merriman III's father] at Hancock Hospital in May—May 16th and he had told me that [Merriman Sr.] had gotten a gun permit, that he had opened it, that it was [Merriman III's] and that he wasn't gonna give it to him um, until [Merriman III] had brought back some things that he said were his and that he was just gonna keep it.

(Tr. 113). Similarly, the State asked Merriman III's ex-girlfriend whether she had ever been approached about Merriman III's gun permit, and she testified:

> No, not that I'm aware of. The only time he ever approached me was right after [Merriman Sr.'s wife] passed away[.] [H]e had contacted me and asked me all kinds of questions about all kinds of different things pertaining to if I knew about a gun, if I knew about all these things because he said supposedly all kinds of things came up missing out of the church. Um, he questioned me about freezers, money, guns. Just kept going and it wasn't really—he was just trying to push me to see if I had any information on him. Obviously, even though we weren't together, we were still really close that whole timeframe. We were—we weren't technically together but we were together. I mean so I was around him often and out of word for word [sic] it was he—he couldn't see [Merriman III] doing something like that but he was pushing me to try to get me to admit, that I knew something about this but the whole time we were together I never

seen anything or ever heard about anything about [Merriman III]
getting there to get these things or do any of it and I personally
never seen any guns that would have been taken from there.
That wasn't in my household when we were together.

(Tr. 122). She admitted that Merriman had owned guns when they were
together, but she said that she did not think he had gotten any new guns.
Merriman III's trial counsel did not object to any of the testimony from
Detective Cutler, Merriman III's ex-wife, or Merriman III's ex-girlfriend.

[14] At the conclusion of the trial, the jury found Merriman III guilty as charged.
The trial court sentenced him to eighteen (18) months, which it ordered
suspended to probation. Merriman III now appeals.

# Decision

[15] On appeal, Merriman III raises two issues: (1) whether there was sufficient
evidence to support his conviction; and (2) whether he received effective
assistance of trial counsel. We will address each of those issues in turn.

## 1. Sufficiency of the Evidence

[16] First, Merriman III argues that there was insufficient evidence to support his
conviction for Class D felony residential entry because there was no evidence
that he actually entered Merriman Sr.'s house, other than Merriman Sr.'s claim
that the gun permit was missing. He asserts that the State proved only that he
was on the outside of his grandfather's residence and that the door was broken,

not that he entered the house. In support of this claim, he argues that the evidence of the missing gun permit was not sufficient to show his entry.

[17]    In order to convict Merriman III of residential entry, the State had to prove that he: "knowingly or intentionally [broke] and [entered] the dwelling of another person." I.C. § 35-43-2-1.5. Residential entry is a lesser included offense of burglary which allows a felony prosecution for a housebreak without the need for proof of the intent to commit a target crime. *Patterson v. State*, 729 N.E.2d 1035, 1043 (Ind. Ct. App. 2000). A conviction may be sustained based on circumstantial evidence. *Baltimore v. State*, 878 N.E.2d 253, 258 (Ind. Ct. App. 2007), *trans. denied.* Circumstantial evidence need not exclude every reasonable hypothesis of innocence; rather, circumstantial evidence can sustain a conviction if an inference may reasonably be drawn from the evidence to support the judgment. *Id.*

[18]    Our standard of review for a sufficiency of the evidence claim is that we should only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied.* We must consider only the probative evidence and reasonable inferences supporting the verdict, and we do not reweigh evidence or judge the credibility of witnesses. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). In addition, we consider only the evidence most favorable to the judgment and the reasonable inferences stemming from that evidence. *Perez*, 872 N.E.2d at 213.

[19]     Here, we conclude that there was sufficient evidence to prove that Merriman III entered Merriman Sr.'s house. He claims that the missing gun permit was not sufficient evidence to prove that he entered the house. However, the circumstances and the nature of the gun permit were such that it was a reasonable inference, based on the evidence, that he entered his Grandfather's house and took the permit. For one, his grandfather had given him a three-day ultimatum and threatened to withhold the gun permit, thereby giving him a motive to take the gun permit. Our supreme court has noted that "evidence of motive is entirely admissible and probative on the issue of the defendant's guilt." *Biggerstaff v. State*, 432 N.E.2d 34, 36 (Ind. 1982). Second, the gun permit was in Merriman III's name and listed his birth date. As a result, he was the only person to whom the permit was consequential. In combination with the fact that: (1) the Esteps saw Merriman III at Merriman Sr.'s house the day that the door was broken; (2) the door was broken; and (3) the gun permit was missing, it was reasonable for the jury to infer that Merriman III had entered Merriman Sr.'s house and retrieved the permit. *See Baltimore*, 878 N.E.2d at 258 ("[C]ircumstantial evidence can sustain a conviction if an inference may reasonably be drawn from the evidence to support the judgment."). Since Merriman III does not otherwise challenge the State's evidence regarding the elements of residential entry, we therefore conclude that there was sufficient evidence to support his conviction.

## 2. Ineffective Assistance of Counsel

[20]	Next, Merriman III argues that his trial counsel provided ineffective assistance by failing to object based on Evidence Rule 404(b) to the State's introduction of evidence at trial.[3] Evidence Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Merriman III asserts that the evidence the State introduced regarding his grandfather's belief that he had previously stolen his grandfather's guns and other belongings stored in the church constituted evidence of prior bad acts. Because the trial court granted his motion requiring the State to provide pretrial notice of any Rule 404(b) evidence that it wished to admit at trial, and the State

---

[3] Before proceeding to Merriman III's specific allegations of error, we pause to note the procedural effect of him bringing his claims of ineffective assistance of trial counsel on direct appeal. While this practice is not prohibited, a post-conviction proceeding is generally "'the preferred forum'" for adjudicating claims of ineffective assistance of counsel because the presentation of such claims often requires the development of new facts not present in the trial record. *McIntire v. State*, 717 N.E.2d 96, 101 (Ind. 1999) (quoting *Woods v. State*, 701 N.E.2d 1208, 1219 (Ind. 1998), *reh'g denied*, *cert. denied)*. If a defendant chooses to raise a claim of ineffective assistance of counsel on direct appeal, "the issue will be foreclosed from collateral review." *Woods*, 701 N.E.2d at 1220. This rule should "likely deter all but the most confident appellants from asserting any claim of ineffectiveness on direct appeal." *Id.* When a claim of ineffective assistance of counsel is based solely on the trial record, as it is on direct appeal, "every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight[,]" and "[i]t is no surprise that such claims almost always fail." *Id.* at 1216 (quoting *United States v. Taglia*, 922 F.2d 413, 418 (7th Cir. 1991), *cert. denied)*.

did not provide pretrial notice, he consequently asserts that his counsel was ineffective for failing to object to the various trial witnesses that testified about his grandfather's beliefs that Merriman III had stolen his property. For the same reason, he also objects to the State's admission of the video of his June 4, 2014 interview with Detective Cutler.

[21] We analyze claims of ineffective assistance of trial counsel according to the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). *Emerson v. State*, 695 N.E.2d 912, 918 (Ind. 1998), *reh'g denied*. An appellant must show both deficient performance and resulting prejudice in order to prevail on an ineffective assistance of counsel claim. *Carillo v. State*, 982 N.E.2d 468, 472 (Ind. Ct. App. 2013). A deficient performance is a performance that falls below an objective standard of reasonableness. *Id.* Prejudice exists when a defendant shows there is a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002)). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001)).

[22] "'When considering a claim of ineffective assistance of counsel, we strongly presume 'that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *McKnight v. State*, 1 N.E.3d 193, 200 (Ind. Ct. App. 2013) (quoting *Morgan v. State*, 755 N.E.2d 1070, 1073 (Ind. 2001)). A defendant must offer "'strong and

convincing evidence'" to overcome this presumption. *Id.* (quoting *Williams*, 771 N.E.2d at 73)).

[23] To prevail on a claim of ineffective assistance of counsel due to the failure to object, an appellant must show that the objection would have been sustained if made. *Benefield v. State*, 945 N.E.2d 791, 799 (Ind. Ct. App. 2011). We are not convinced that, here, the trial court would have sustained Merriman III's trial counsel's objection to the testimony regarding the guns and other allegedly missing items if he had made such an objection on the grounds of lack of notice under Rule 404(b).

[24] Essentially, Merriman III claims that the State violated the trial court's order requiring it to provide pretrial notice of any Rule 404(b) evidence. In *Dixon v. State*, 712 N.E.2d 1086, 1091 (Ind. Ct. App. 1999), this Court held that "we recognize no 'hard and fast' rule governing the time period in which the State should respond to an appropriate request under 404(b)." Rather, "the circumstances of the particular case should govern whether advance notice provided by the State to defense counsel is reasonable." *Id.* In *Burgett v. State*, 758 N.E.2d 571 (Ind. Ct. App. 2001), *trans. denied*, we held that, even though the trial court had granted the defendant's "Motion for Pretrial Disclosure of the State's Intention to Offer Rule 404(b) Evidence at Trial," as here, the trial court had the discretion to allow the State's notice of its intent to introduce evidence of prior bad acts at trial on the same day as the trial. *See id.* at 574. We reasoned that, even though the defendant had not received pretrial notice, the "purpose of the notice provision, under Evid. R. 404(b), is to reduce surprise

and promote early resolution of questions of admissibility." *Id.* at 579. Because Burgett's defense counsel "was aware of the existence of Burgett's prior bad acts and was aware of a likelihood that the State would want to use this information," there was no danger of surprise requiring the evidence to be inadmissible absent pretrial notice. *Id.*

[25] Here, Detective Cutler questioned Merriman III about his grandfather's beliefs that he had stolen the guns, and Merriman III was very aware that a primary reason he was a suspect in the instant case was because Merriman Sr. had given him an ultimatum to give the guns back within three days or he would withhold the gun permit. As a result, there was no danger that Merriman III would be "surprised" at trial by the witnesses' testimonies regarding his grandfather's belief that he had stolen the guns.

[26] Further, the evidence was admissible under Evidence Rule 404(b). When a defendant objects to the admission of evidence on the grounds that it violates Evidence Rule 404(b), we: (1) determine whether evidence of prior bad acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of such evidence against its prejudicial effect. *Id.*

[27] The evidence that Merriman Sr. believed Merriman III had stolen his guns was relevant for motive because it was intertwined with the ultimatum that Merriman Sr. had given Merriman III about his gun permit. As we stated above, motive is always relevant in the proof of a crime. *See id.*

[28] For these reasons, we are not convinced that the trial court would have sustained an objection if Merriman III's counsel had objected to the witnesses' testimonies regarding Merriman Sr.'s guns and missing items and the State's admission of the video of Merriman III's police interview. Thus, we are not convinced that Merriman III's trial counsel rendered deficient performance by failing to object.

[29] Moreover, Merriman III has failed to meet his burden of showing that he was prejudiced by his trial counsel's lack of objection. Regardless of whether his trial counsel would have prevailed if he had made an objection, however, we also find that his counsel was not ineffective because we are not convinced that the admission of the evidence prejudiced Merriman III's defense. In order to prevail on an ineffective assistance of counsel claim, a defendant must prove that his counsel's errors prejudiced his defense. *Carillo*, 982 N.E.2d at 472. Prejudice exists when a defendant shows there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*

[30] Even if Merriman III's trial counsel had objected and the trial court had held that the witnesses' testimonies regarding the guns and alleged thefts were inadmissible, there was still sufficient evidence to support Merriman III's conviction. The State introduced evidence that Merriman Sr. threatened to withhold Merriman III's permit, that a witness saw Merriman III heading to the back of Merriman Sr.'s house the same day that his back door was broken, that the back door was in fact broken, and that the permit was missing the next day.

In light of this evidence, we conclude that Merriman III had failed to show that the result of the proceeding would have been different. Accordingly, we likewise conclude that his counsel did not provide ineffective assistance. *See id.*

[31] Affirmed.

Vaidik, C.J., and Robb, J., concur.